Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>PACIFIC COAST PRODUCERS; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC

("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution

Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.    INTRODUCTION

1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties,

and remediation against Defendant PACIFIC COAST PRODUCERS ("Defendant") for current

and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES")

permit requirements of the CWA.

**Notice Letter**

2.     On or about September 6, 2024, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendant, including a copy delivered to Defendant by certified mail, to Facility Manager, Pacific Coast Producers, 32 E Tokay Street, Lodi, California ("the facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.     A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.     More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.

5.     Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.     This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II. PARTIES

**Plaintiff**

7.     Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendant**

8.     Plaintiff is informed and believes, and on such information and belief alleges, that Defendant PACIFIC COAST PRODUCERS, located at 32 E Tokay Street, in Lodi, California, is a California corporation in good standing with the California Secretary of State.

9.     Plaintiff is informed and believes, and on such information and belief alleges, that Defendant Pacific Coast Producers is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

11.     Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

### IV.  ARTICLE III STANDING

12.     Plaintiff's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) in California.

13.     Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the CWA by failing to comply with all standard conditions of the Industrial General Permit.

14.     Plaintiff's associational members volunteer their resources to join EDEN's organizational purpose and mission.

15.     Plaintiff's associational members reside throughout Northern California.  Some of EDEN's members reside, work and/or recreate near the Mokelumne and San Joaquin Rivers, tributaries of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, duck hunting, sportfishing, swimming, hiking, bird watching,

photography and nature walks.  Their use and enjoyment of these natural resources has been and continues to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

16.     Plaintiff has Article III standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury fairly traceable to Defendant's violations of the CWA and Industrial General Permit, which likely can be redressed by a judicial decision granting Plaintiff the injunctive relief requested herein.

17.     The aesthetic and recreational interests of the individual associational members of Plaintiff with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA, as delineated herein.

18.     Plaintiff's associational members who qualify for standing in this matter are all current members who have been members of EDEN since at least September 6, 2024, the date that Plaintiff provided to Defendant the Notice Letter attached hereto as **Exhibit A.**

19.     Defendant's ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to Plaintiff and its current standing members.

20.     The relief requested herein will redress the ongoing injury in fact to Plaintiff and its members.

21.     Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of EDEN.

## V. <u>STATUTORY BACKGROUND</u>

22.     Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

23.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into Waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act.  33 U.S.C. § 1342

24.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water Dischargers. 33 U.S.C. § 1342(p)

25.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

26.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1)

27.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

28.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

29.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties

under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

30.     Violations of the provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

**A.  General Permit**

31.     The Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

32.     The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

33.     The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

34.     A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm water/igp_20140057dwq.html

35.     The General Permit includes both absolute *discharge prohibitions* and substantive and procedural *standard condition* provisions.

36.     To discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Notice of Intent to Discharge Storm water ("NOI") and an initial Storm Water Pollution Prevention Plan ("SWPPP") and Site Map.

37.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

### 1.  **SMARTS Compliance Database**

38.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers enter and manage storm water data associated with General Permit compliance.

39.     SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Dischargers' compliance with the General Permit and to pursue Dischargers who fail to comply, utilizing the citizen's suit provision of the CWA.

40.     SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

41.     The General Permit requires Dischargers to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Notices of Intent to Discharge Storm Water, Storm Water Pollution Prevention Plans and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

### 2.  **Discharge Prohibitions of the General Permit**

42.    The discharge related prohibitions of the General Permit include Effluent Limitation V(A) of the General Permit, which requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

43.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

44.    Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plans or the applicable Regional Water Board's Basin Plan.

### 3.  **Standard Conditions of the General Permit**

45.    In addition to discharge prohibitions, the General Permit contains a variety of substantive and procedural standard conditions.

46.    The General Permit requires that Dischargers comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

47.    The primary standard conditions of the General Permit include the following:

(a)    Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)    Implementing and maintaining *Best Management Practices*;

(c)     Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)     Collecting and analyzing *storm water runoff samples* four times per year;

(e)     Collecting the *storm water samples during qualified storm events, from all discharge locations, in all drainage areas* in places which are representative of industrial operations;

(f)     Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)     Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)     Preparing compliant *Exceedance Response Reports* in the event that storm water sampling data confirms an annual exceedance of any sampling parameter within the specified time limits, and certifying and submitting the reports to SMARTS;

(i)     Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)     Establishing a *Pollution Prevention Team* of at least two on-site employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

<u>SWPPP and Site Map Requirements</u>

48.     All Dischargers are required to develop and implement a Storm Water Pollution Prevention Plan.

49.     The main objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the Discharger's facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit § X(C).  These BMPs must achieve compliance with the General Permit's

effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

50.    To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

51.    Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

52.    Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of a pollution prevention team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a description of potential pollutant sources; an assessment of potential pollutant sources (specifically, whether the pollutants have the potential to commingle with storm water);  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and discharge points and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.   General Permit §§ X(A)-X(I)

53.    The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

54.    Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water discharges, locations of storm water collection and conveyance systems, associated discharge locations, sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where

significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas. General Permit § X(E)

<u>Best Management Practices</u>

55. The General Permit requires all Dischargers to implement and maintain the following minimum Best Management Practices to reduce or prevent pollutants in industrial storm water discharges at their facility: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping. General Permit § X(H)(1)

56. The General Permit further requires Dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. General Permit § X(H)(2)

57. Failure to implement minimum and advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

58. The General Permit requires Dischargers to develop and implement an adequate Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

59. As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce storm water discharges, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

60.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

61.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

62.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

63.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit § XI(B)(6)(c)

64.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations are conducting during dry weather and must include observing each drainage area for the presence of non-storm water discharges; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and all other potential sources of industrial pollutants, and monitoring BMPs for effectiveness. Sampling event visual observations are conducted at the same time as sampling occurs at a discharge location and must include observing storm water discharges for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris and sources of any discharge pollutants.  General Permit § XI(A)

65.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.

66.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

67.     The NALs established under the General Permit for pollution parameters applicable to all Dischargers are set forth in Table 2 of the General Permit, which is incorporated herein by reference.

NAL Exceedances-Exceedance Response Actions

68.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than the annual NALs, which are listed on Table 2 of the General Permit. The reporting year runs from July 1 to June 30.

69.     An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A), Table 2

70.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status" commencing July 1 of the reporting year following the entry into Level 1 status.

71.     Once a Discharger has entered Level 1 Status, by October 1 following commencement of Level 1 status, it must conduct a thorough facility evaluation with the assistance of a Qualified Industrial Stormwater Practitioner (QISP) of all drainage areas to determine the industrial pollutant sources at the facility that are or may be related to the

exceedance(s), and identify the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future exceedances.   General Permit § XIII(C)

72.    By January 1 following commencement of Level 1 status, the Discharger must revise its SWPPP, implement any additional BMPs identified in the evaluation, and certify and submit to SMARTS a Level 1 Exceedance Response Action (ERA) Report.  General Permit § XIII(C)

73.    If a discharger exceeds an applicable NAL during Level 1 Status, it is elevated to "Level 2 Status."  General Permit §XII(D)

74.    On January 1 of the reporting year following entry into Level 2 Status, a Discharger is required to submit to SMARTS a Level 2 ERA Action Plan identifying its selection of one of three options to remediate the continuing exceedances: implementation of additional BMPs, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  The Action Plan must also include a schedule for completion of the tasks.  General Permit § XII(D)(1)

75.    On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, the Discharger is required to submit a Level 2 Technical Report demonstrating its efforts to implement the additional BMPs or confirming the non-industrial sources of the pollutants causing the exceedances.  General Permit § XII(D)(2)

Annual Comprehensive Facility Evaluation

76.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

77.    Section XVI(A) of the General Permit requires all Dischargers to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

78.    Annual Reports are auto populated by SMARTS from Dischargers' answers to a series of twelve questions, which require mostly yes/no responses.

79.    The questions include whether the Discharger has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all discharge locations at its facility; and where the facility is located within an impaired watershed, the Discharger has assessed whether any of the receiving water impairments are potential pollutants present at their facility.

80.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

<u>Certification of Compliance Documents</u>

81.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**B.  <u>Central Valley Region Basin Plan</u>**

82.    The Regional Water Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin

Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

83.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

84.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

85.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

86.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

87.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

88.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

89.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A

(Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

90.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

91.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

92.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

## VI.  SPECIFIC FACTUAL ALLEGATIONS

### A.  The Facility

93.    Pacific Coast Producers, located at 32 E Tokay Street in Lodi, California, is a facility that processes and cans apricots, peaches and apricot nectar.

94.    Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 2033-Canned fruits and vegetables, based on public records.

95.    SIC Code 2033 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

96.    Defendant stores and handles industrial chemicals and materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

97.    During rain events, storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility settle onto the ground.

98.    Storm water flowing over these areas collects suspended sediment, dirt, metals, and other chemicals and toxic pollutants as it flows towards the Facility's storm water channels, and discharges from the Facility into its Receiving Waters.

99.    Based on the foregoing, Plaintiff alleges that Defendant is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

**B.    The Facility's Receiving Waters**

100.    Based on Plaintiff's investigation, including but not limited to a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"); SWPPP and Site Map, aerial photography and drone footage; federal, state and local regulatory agency mapping tools; and eyewitness reports, storm water leaves the boundaries of Defendant's facility and enters Mokelumne River, via both the City of Lodi MS4  and surface flow, before discharging to the San Joaquin River.  The Mokelumne and San Joaquin Rivers are both navigable Waters of the United States.

101.    On May 12, 2015,  Defendant certified under penalty of law to the Water Board and the general public via SMARTS that storm water discharges from the facility enter the Mokelumne River.  (See **Exhibit B**, attached hereto and incorporated herein by reference)

102.    Plaintiff alleges that the Best Management Practices at Defendant's facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to Waters of the United States.

**C.    Defendant's General Permit Violations**

Deficient SWPPP/Failure to Follow SWPPP

103.    Plaintiff alleges that since at least September 15, 2019, Defendant has failed to implement an adequate SWPPP for the facility and has failed to comply with the terms of its deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

104.    Defendant's continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by Pacific Coast Producers, as well as by required documents which have not been uploaded to SMARTS.

105.    Defendant's continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

106.    As is more particularly described in **Exhibit A,** attached hereto and incorporated herein by reference, Plaintiff's Notice Letter issued to Defendant delineated numerous deficiencies in Defendant's SWPPP and Site Map uploaded to SMARTS on May 10, 2023.

107.    The 60-day notice period on Plaintiff's Notice Letter expired on November 5, 2024, without either partial or full correction of the violations alleged in the Notice Letter.

108.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

109.    According to information available to Plaintiff, Defendant's current SWPPP has not been evaluated to ensure its effectiveness and has not been revised as required by the General Permit to reflect true conditions at the Facility and to prevent discharges of contaminated storm water.

110.    According to information available to Plaintiff, Defendant's current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; discharge locations and mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

111.    Plaintiff alleges that Defendant's current SWPPP and Site Map do not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT.

112.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continue to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

113.    In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

114.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Mokelumne and San Joaquin Rivers.

115.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP/Site Map are ongoing and continuous.

Monitoring and Reporting/ Storm Water Sampling

116.    Plaintiff alleges that Defendant's monitoring and reporting program at Pacific Coast Producers in Lodi is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

117.    Defendant's deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

118.    Defendant's deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and government agencies, as well as other relevant documents maintained by Defendant and governmental and regulatory agencies.

119.    Since September 15, 2019, Defendant has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

120.    In addition, Defendant has failed to conduct monthly visual observations of storm water discharges at the facility since at least September 15, 2019.

121.    Defendant has also collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

122.    Defendant has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

123.    Defendant has failed to analyze the facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

124.    Defendant has failed to deliver the facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>False Sampling Frequency Certification</u>

125.    On November 27, 2017, Defendant submitted to the Water Board via the SMARTS system a false Sampling Frequency Reduction Certification, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

126.    Defendant's submittal of the false Sampling Frequency Reduction Certification is ongoing, as to date Defendant has failed to withdraw the certification and continues to operate a deficient monitoring and reporting system based on the improper and false Sampling Frequency Reduction Certification.

<u>False Information Provided to the Water Board</u>

127.    On May 11, 2023, Defendant made objectively false statements to a Water Board inspector,  as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

128.    Defendant's submission of false information to the Water Board is ongoing, as to date Defendant has failed to retract its false statements.

<u>Falsification of Annual Reports</u>

129.    Since September 15, 2019, Defendant has submitted numerous objectively false statements in Annual Reports provided to the Water Board via SMARTS, in violation of the standard conditions of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

130.    Defendant's submission of objectively false statements in its Annual Reports and continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant.

131.    Defendant's submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

132.    Defendant's submission of false statements to the Water Board and the general public is ongoing and continuous.

<u>Failure to Implement BAT/BCT; BMP Deficiencies</u>

133.    Since at least September 15, 2019, Defendant has failed to identify and implement Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants.

134.    These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

135.    Defendant's failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

136.    Defendant's BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

137.    Defendant's BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

138.    Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

139.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the San Joaquin River.

<u>Discharges of Contaminated Storm Water</u>

140.    Since at least September 15, 2019, Defendant has discharged contaminated storm water from its facility in violation of the absolute discharge provisions and the standard conditions of the General Permit, as is more particularly described herein, as well as in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ I(D), I(C), I(K)(77), III, V(A), VI, X, X.I, XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b); 33 U.S.C. § 1365(f)(7)

141.    Specifically, on June 7, 2024, Defendant intentionally discharged contaminated storm water into a MS4 drain inlet that discharges directly to Waters of the United States. Furthermore, Defendant's intentional discharges of polluted storm water were unauthorized. Additional details and photographs of the unauthorized discharges are contained in **Exhibit A**.

142.    Defendant's discharges of contaminated storm water in violation of the General Permit are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

143.    Defendant's discharges of contaminated storm water in violation of the General Permit are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

144.    Information available to Plaintiff indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

145.    Due to the nature of the operations at Defendant's facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

146.    Defendant has repeatedly failed and refused to include accurate information in the Facility's SWPPP regarding industrial operations, processes and materials, as well as locations where sampling and monitoring are required; and Defendant has failed to test Facility storm water runoff samples for all required parameters, resulting in unmonitored pollutants freely flowing from the Facility into the Mokelumne and San Joaquin Rivers and tributaries.

147.    Specifically, Plaintiff is informed and believes, and on that basis alleges, that the unmonitored pollutants being discharged by the Facility include Aluminum, Iron, Chemical

Oxygen Demand (COD), Biochemical Oxygen Demand (BOD), Copper, Zinc, and pH affecting substances.

148.    Defendant's discharges of contaminated storm water in violation of the General Permit is ongoing and continuous.

Failure to Train Employees

149.    Since at least September 15, 2019, Defendant has failed to implement and train a Pollution Prevention Team at the facility, in violation of the standard conditions of the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

150.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

151.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

152.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendant and governmental/regulatory agencies, as well as other relevant documents maintained by Defendant and governmental/regulatory agencies.

153.    Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by Defendant's ongoing and continuing General Permit violations.

154.     Other evidence of Defendant's failure to implement and train a Pollution Prevention Team includes the fact that previously designated Team Members have left the Facility and have been replaced without being trained, as well as that some of the designated Pollution Prevention Team Members are regional employees not assigned to work at the Lodi Pacific Coast Producers Facility.

155.     Defendant's failure to implement and train a Pollution Prevention Team in violation of the General Permit is ongoing and continuous.

### D. Information Injuries Caused by Defendant's General Permit Violations

156.     In addition to harming the aesthetic and recreational interests of Plaintiff's members with standing in this matter, Defendant's violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

157.     As set forth in more detail herein, Defendant has failed and refused to comply with all mandatory standard conditions of the General Permit, including maintaining a deficient SWPPP which includes objectively false information related to drainage, outdoor handling of industrial materials and storm water flow/sampling locations; failing to collect and analyze the required number of storm water samples; failing to test storm water samples for the proper parameters; and providing incomplete and false information in Annual Reports.

158.     Defendant's failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's members with Article III standing from: (a) accessing on SMARTS the true operational facts relevant to Defendant's facility; and (b) acquiring accurate and complete data related to the unmonitored pollutants emanating from Defendant's facility during rain events and discharging into the facility's Receiving Waters.

159.    As such, Plaintiff's members with Article III standing are unable to fully assess the extent of Defendant's General Permit violations, as well as the types and levels of pollutants entering the affected waterways due to Defendant's willful violations of the standard conditions of the General Permit; or to even gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

160.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

161.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP, including a Site Map.

162.    As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

163.    Each day since September 15, 2019, that Defendant has failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

164.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

165.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

166.     The General Permit requires Dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

167.     As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for the Pacific Coast Producers facility.

168.     Each day since at least September 15, 2019, that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

169.     These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop and implement a compliant monitoring and reporting program.

### THIRD CAUSE OF ACTION
**Submission of False Statements to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

170.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

171.     Section XVI of the General Permit requires that all documents submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information. As delineated herein, Defendant made false representations in the Facility's Annual Reports and has failed to correct or retract the false statements.

172.     Furthermore, Defendant made intentionally false statements directly to a Regional Water Board inspector, as delineated herein.

173.    Each time since September 15, 2019, that Defendant made false or misleading statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

174.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's failure to withdraw any of the false and/or incomplete Reports submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

175.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Management Practices (BMPs), including Best Available Treatment (BAT) for toxic and nonconventional pollutants and Best Conventional Treatment (BCT) technologies for conventional pollutants.

176.    As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

177.    As alleged herein, Defendant has failed to implement the required minimum Best Management Practices at the Facility.

178.    Each day since at least September 15, 2019, that Defendant failed to implement the required minimum BMPs and to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

179.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate BMPs at its Facility.

### FIFTH CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

180.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

181.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

182.    Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

183.    Plaintiff is informed and believes, and thereupon alleges, that since at least September 15, 2019, Defendant has been discharging polluted storm water from its facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

184.    Furthermore, on June 7, 2024, Defendant intentionally discharged polluted storm water into a municipal drain inlet which flows directly into the Mokelumne River, as delineated herein.

185.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant's facility.   The polluted storm water then flows untreated into the Mokelumne and San Joaquin Rivers.

186.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water

quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

187.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

188.    Every day since at least September 15, 2019, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act.  33 U.S.C. § 1311(a)

189.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendant's continued failure to develop, implement and maintain adequate minimum BMPs at its Facility; and failure to comply with required monitoring and reporting provisions of the General Permit.

**SIXTH CAUSE OF ACTION**
**Failure to Properly Train facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

190.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

191.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

192.    Section X(H)(f) of the General Permit also requires that Dischargers ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

193.     Since at least September 15, 2019, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendant to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendant to immediately operate the Pacific Coast ProducersPacific Coast Producers facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendant from discharging pollutants to the surface waters surrounding its facility until such time as Pacific Coast Producers has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.     Order Defendant to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendant to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.     Order Defendant to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

8.     Award such other and further relief as may be just and proper.

Dated:  January 10, 2025                              Respectfully,


                                                     By: ___/S/ Adam D. Brumm_____
                                                          Adam D. Brumm
                                                          Attorney for Plaintiff

# EXHIBIT A



## Central Valley Eden Environmental Defenders

September 6, 2024

Via US Mail, Certified and Email

Mike Vangundy          Email:  mvangundy@pcoastp.com
Facility Manager
Pacific Coast Producers
32 East Tokay Street
Lodi, CA 95240

Via Email

Mona O. Shulman          Email:  mshulman@pcoastp.com
Pacific Coast Producers
631 N. Cluff Avenue
Lodi, CA  95240

Via US Mail

Filejet, Inc.
Agent for Pacific Coast Producers
10440 Pioneer Boulevard, Suite 8
Santa Fe Springs, CA  90670

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Pacific Coast Producers:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against Pacific Coast Producers ("Discharger" or "Pacific Coast Producers") and the respective corporate officers and other legally responsible parties, including specifically **Mona O. Shulman**, legally responsible person, responsible corporate officer (Vice President) and General Counsel of Pacific Coast Producers, for violations of the Federal Clean Water Act ("CWA" or

1520 E. Covell Blvd #B5          Telephone:  (800) 545-7215
Davis, CA  95616          Email:  admin@edendefenders.org

"Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Pacific Coast Producers facility located at 32 East Tokay Street in Lodi, California ("the Facility" or "the site").

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. EDEN has members throughout California. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Pacific Coast Producers, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Pacific Coast Producers to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Pacific Coast Producers under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board

("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around March 30, 1992, Pacific Coast Producers submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit; and on May 12, 2015, Pacific Coast Producers reapplied for the General Permit effective July 1, 2015. Pacific Coast Producers' assigned Waste Discharger Identification number ("WDID") is 5S39I001817.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Pacific Coast Producers has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 Code of Federal Regulations §§122.22, 122.26; 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.    THE LOCATION OF THE ALLEGED VIOLATIONS

### A.    **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Pacific Coast Producers' permanent facility address of 32 East Tokay Street in Lodi, California.

Pacific Coast Producers is a facility that produces and processes canned food products. Facility operations are covered under Standard Industrial Classification Code (SIC) 2033 - Canned fruits and vegetables.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2033, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G).

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   The Affected Receiving Waters

The Facility discharges into the Mokelumne River by way of the City of Lodi's MS4 system ("Receiving Waters").  The Facility's Receiving Waters are impaired for Chlorpyrifos, Dissolved Oxygen (DO), and Metals Screen – Copper, Mercury, and Zinc.

The Mokelumne River is a water of the United States.  The CWA requires that water bodies such as the Mokelumne River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants.  Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

### III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.  *Deficient SWPPP and Site Map*

Pacific Coast Producers' current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map dated May 10, 2023, for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

1.      The Site Map does not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

A.  All Facility entrances/exits;

B.  An accurate depiction of all storm water drainage areas within the Facility boundary;

C.  Accurate storm water flow direction of each drainage area;

D.  At least one sampling location for every drainage area;

E.  Sampling points which are representative of facility operations;

F.  Locations of storm water collection and conveyance systems associated with discharge locations and the accurate flow direction (i.e. storm drain inlets and underground conveyances);

G.  Locations and descriptions of all structural control measures that affect industrial storm water discharges, authorized NSWDs and/or run-on;

H.  Municipal storm drain inlets which receive the Facility's industrial storm water discharges and authorized non-storm water discharges (IGP Section X.E.3.a);

I.  Identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas or other roofed structures;

J.  Locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred; and

K.  All areas of industrial activity subject to the General Permit, including industrial storage areas, storage tanks, shipping and receiving areas, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, material and scrap storage areas ("boneyards"), waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, cooling towers, and all other areas of industrial activity that may have potential pollutant sources.

2.  The SWPPP does not include all the required elements, as indicated below:

A.  The accurate **date that the SWPPP was initially prepared** (Section X.A.10);

B.  A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

C.  A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each

industrial process; and the type,  characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (Section X.G.1.a);

D.  An accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

E.  Adequate and accurate description of **Minimum Best Management Practices** (BMPs) currently implemented at the facility, including Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Sections X.H.1 and X.H.4.a);

F.  An identification of all **Non-Storm Water Discharges (NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.1.e);

G.  An appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures and procedures for field instrument calibration instructions (Section X.I);

H.  The SWPPP indicates that Pacific Coast Producers qualifies for **Sampling Frequency Reduction** pursuant to Section XI.C.7. Pacific Coast Producers is not in fact eligible for a Sampling Frequency Reduction because Pacific Coast Producers was not in full compliance with the requirements of the General Permit as of the date of the filing of the Sampling Frequency Reduction certificate.

I.  A complete and accurate Pollutant Source Assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the Facility likely to come into contact with stormwater (Section XI.B.6);

EDEN's investigation confirms that Aluminum, Antimony, Benzene, Biochemical Oxygen Demand ("BOD"), Chemical Oxygen Demand ("COD"), Copper, E.Coli,

Iron, Lead, Magnesium, Naphthalene, Nickel, Phosphate, Sulfates/Sulfides, Total Petroleum Hydrocarbons ("TPH"), Volatile Organic Compounds (VOCs), Xylenes, Zinc, and Phosphorus are present in industrial operations at the Facility. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c and XI.B.6.e of the General Permit.

J.   An appropriate and complete discussion of **Drainage Areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section X.I); and

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B.   *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.   Failure to Conduct Visual Observations and Maintain Required Records/Reports

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations.  The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between September 15, 2019, and the present, Pacific Coast Producers has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.  Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that Pacific Coast Producers has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two (2) Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an appropriate and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Pacific Coast Producers has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2019-20, 2020-21, 2021-22, 2022-23 and 2023-24, and has not provided an adequate or accurate explanation for its failure to do so.

3.  Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."   (Attachment C to General Permit-Glossary)

Pacific Coast Producers' stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date |
|---|
| 9/16/2019 |
| 11/1/2022 |
| 3/28/2023 |
| 3/22/2024 |

4.  <u>Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection</u>

Pursuant to General Permit Section XI.B.8, referring to Attachment H to the General Permit, Dischargers must deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  Pacific Coast Producers' storm water runoff samples listed below were not delivered to the Facility's Laboratory FGL Analytical Chemists in that time frame:

| Sample Date | Date/Time Laboratory Received Sample |
|---|---|
| 3/22/2024 | 3/25/2024 |

5.  <u>Failure to Collect Samples From Each Drainage Area at all Discharge Locations</u>

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations in all drainage areas, regardless of whether the discharges are substantially similar.

According to EDEN's investigation, the Facility has at least 20 industrial drainage areas and at least 30 discharge locations within those drainage areas where industrial activities and processes occur.

The storm water runoff sample analyses Pacific Coast Producers uploaded for samples collected on the dates listed below failed to include samples from all discharge locations at the Facility.

Furthermore, the Facility did not include Representative Sampling Reduction justifications in its current SWPPP with regard to any of  the discharge locations from which it failed to collect storm water samples.

This is an ongoing violation of Section XI.B.4 of the General Permit which is likely to reoccur.

| |
|---|
| 9/16/2019 |
| 1/9/2020 |
| 2/2/2021 |
| 2/19/2021 |
| 12/22/2021 |
| 11/1/2022 |
| 3/28/2023 |
| 3/22/2024 |

6.  Failure to Analyze Storm Water Samples for All Required Parameters

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

Further, Section XI.B.6.e of the General Permit requires Dischargers to analyze for any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix. Test methods with lower detection limits may be necessary when discharging to receiving waters with 303(d) listed impairments or TMDLs.  Pacific Coast Producers' receiving waters are impaired for Copper, Zinc and Dissolved Oxygen, among other impairments.

EDEN's investigation confirms that the following additional parameters must be included in the Facility's sampling process, as they are associated with Pacific Coast Producers' industrial operations: Aluminum, Antimony, Benzene, Biochemical Oxygen Demand ("BOD"), Chemical Oxygen Demand ("COD"), Copper, E.Coli, Iron, Lead, Magnesium, Naphthalene, Nickel, Phosphate, Sulfates/Sulfides, Total Petroleum Hydrocarbons ("TPH"), Volatile Organic Compounds (VOCs), Xylenes, Zinc, and Phosphorus.

The storm water runoff sample analyses Pacific Coast Producers uploaded for samples collected on the dates listed below failed to include all required additional sampling parameters as outlined above.

| |
|---|
| 9/16/2019 |
| 1/9/2020 |
| 2/2/2021 |

| |
|---|
| 2/19/2021 |
| 12/22/2021 |
| 11/1/2022 |
| 3/28/2023 |
| 3/22/2024 |

## 7. Improper/False Submittal of Sampling Frequency Reduction Certification

On November 27, 2017, Pacific Coast Producers' Legally Responsible Person certified and submitted a Sampling Frequency Reduction ("SFR") Certification to SMARTS. However, Pacific Coast Producers does not in fact qualify for Sampling Frequency Reduction pursuant to Section XI.C.7 of the General Permit because the facility was not in full compliance with the General Permit at that time.

Pacific Coast Producers' current SWPPP certified and submitted to SMARTS on May 10, 2023, confirms that the facility is continuing to take advantage of the improperly certified SFR.

The facility was not and is not in compliance with the General Permit for the reasons stated below:

1. Deficient SWPPP and Site Map;
2. Failure to conduct monthly visual observations and retain reports for five years;
3. Failure to collect and analyze the required number of storm water samples;
4. Failure to analyze storm water samples for all required parameters;
5. Failure to collect samples from each drainage area at all discharge locations;
6. Submitting false certifications to the Water Board;
7. Submitting false information in Annual Reports to the Water Board and public;
8. Deficient and ongoing BMP implementation; and
9. Failure to implement and train a pollution prevention team.

## C. FALSE INFORMATION PROVIDED TO THE WATER BOARD

Section XXI.L of the General Permit provides that all documents submitted to the Water Board through SMARTS must include the following certification:

### L. Certification

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that*

*qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Section XXI.N of the General Permit incorporates Clean Water Act section 309(c)(4) which provides that any person who makes any false material statement, representation or <u>certification</u> in any record or other document submitted to the Water Board via SMARTS not only violates a standard condition of the General Permit, but also is guilty of a criminal act, punishable by imprisonment and fines.

Pacific Coast Producers has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by including objectively false information in Annual Reports it submitted to the Regional Water Board for the reporting years 2019-20, 2020-21, 2021-22, 2022-23 and 2023-24, as described below.

1. <u>False Representations related to Question 3 – Sampling Frequency</u>

Question No. 3 of the Annual Report requests a "Yes" or "No" response to the question: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?" If the Discharger's response is "No", an explanation must be provided in Attachment 1 to the Annual Report.

Pacific Coast Producers falsely responded "Yes" to Question No. 3 in its Annual Reports for the reporting years 2021-22 and 2023-24.

Erick Watkins certified in the Annual Report for the reporting year 2021-22; and Beverly Kennedy certified in the Annual Report for the reporting year 2023-24, which were submitted to the Regional Water Board through the SMARTS system on July 12, 2022, and July 2, 2024, respectively, that Pacific Coast Producers had collected and analyzed the required number of Qualifying Storm Events during the reporting year for all discharge locations (in accordance with Section XI.B).

However, Pacific Coast Producers did not in fact collect and analyze the required number of storm water samples. During the reporting years 2021-22 and 2023-24, the facility collected and analyzed **only one storm water sample**.

    2.  <u>False Representations related to Question 4 – Stormwater Discharge Locations</u>

Question No. 4 of the Annual Report requests "How many storm water discharge locations are at your facility?"

Pacific Coast Producers' response to Question 4 included in its Annual Reports for the reporting years 2019-2020, 2020-2021, 2021-22 and 2022-23, was objectively false in that the answer provided was "5", when in fact the correct number of storm water discharge locations at the Facility is at least 20 and likely more than 30.

Pacific Coast Producers' response to Question 4 included in its Annual Report for the reporting year 2023-24 was objectively false in that the answer provided was "3", when in fact the correct number of storm water discharge locations at the Facility is at least 20 and likely more than 30.

    3.  <u>False Representations related to Question 8-Watershed Pollutants</u>

Question No. 8 of the Annual Report requests a "Yes" or "No" response to the question of whether the Discharger has included a pollutant source assessment in its SWPPP of the specific pollutants related to its receiving waters, if the receiving waters are located within an impaired watershed. The specific pollutants are auto populated by the Water Board and identified in the final Annual Report in Attachment 2.

The list of Identified Pollutants contained in Attachment 2 to Pacific Coast Producers' Annual Reports which are present in the impaired watershed for Pacific Coast Producers' receiving waters, are: Group A Pesticides, Chlorpyrifos, Diazinon, Dissolved Oxygen, Copper, Zinc, Mercury, PBCs and DDT.

Pacific Coast Producers responded "Yes" to Question No. 8 in its Annual Reports for the reporting years 2019-20, 2020-21, 2021-22, 2022-23 and 2023-24, when in fact it has never included a pollutant source assessment in its SWPPP for the above-listed pollutants.

At the very least, the pollutants of Copper, Zinc and Dissolved Oxygen are present at the facility, as they are associated with industrial materials present at the facility. However, Pacific Coast Producers falsely indicated in its Annual Reports for the reporting years 2019-20, 2020-21, 2021-22, 2022-23 and 2023-24 that these pollutants were not present at the Facility, without ever having conducted the required pollutant source assessment.

Pacific Coast Producers' reporting of the false information in its Annual Reports submitted to the Water Board as delineated above violates the General Permit standard

conditions contained in Sections XXI.L and XXI.N that all documents submitted to SMARTS must be true and correct and may not contain any false material statement, representation or certification.  The violations are ongoing and continuous and likely to reoccur.

4.      <u>False and Misleading Representations Made to Regional Water Board Inspector</u>

On May 11, 2023, Central Valley Regional Water Board inspector Lowell Cotrell conducted an inspection that had been specifically pre-arranged with Pacific Coast Producers legally responsible person, Mona Shulman.

Prior to the inspection, Ms. Shulman and various Pacific Coast Producers staff cleaned up certain portions of the facility and conspired to misrepresent to the Water Board the true nature of all industrial activities and processes, industrial materials and areas of industrial activity; as well as storm water discharge locations and City Sewer connections located at the facility.

During the inspection, Ms. Shulman did in fact orally make misrepresentations of material facts to the Water Board Inspector with respect to the true nature of all industrial activities and processes, industrial materials and areas of industrial activity; as well as storm water discharge locations and City Sewer connections located at the facility.

### D.  *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Pacific Coast Producers has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Pacific Coast Producers' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific BMP Deficiencies*

EDEN has observed the facility four times between April 2023 and August 2024, and has obtained evidence of the following ongoing BMP deficiencies:

- Metal and wooden industrial materials stored outdoors and directly exposed to storm water;

- Full, uncovered waste bins directly exposed to storm water;

- Drain inlets with no visible BMPs;

- No BMPs implemented at the eleven entrance gates to the facility to mitigate off-site sheet flow;

- Vehicle material tire tracking observed in several areas of the facility;

- Unkempt outdoor storage of industrial materials;

- Trash, debris, and an excessive amount of junk on the ground in several areas;

- Industrial Materials stored near or on top of drain inlets;

- Oil, rust, paint, and unknown non-stormwater discharges and other spills and stains on outdoor ground surfaces (some in and around drain inlets);

- Deteriorating or rusted roof tops;

- The outdoor storage area near a roll-up door adjacent to Vine Street was observed emanating a non-stormwater discharge to a MS4 drain inlet on Vine Street;

- A hose or pipe was observed emanating from the side of a building and into an MS4 inlet on Vine Street;

- 

- Trailers containing a reddish raw material with no cover exposed to storm water;

- Roof downspouts routed directly to E Stockton Street with no BMPs; non-storm water discharges emanating from ;

- Broken berms allowing storm water to exit the facility and discharge to a MS4 inlet on E Tokay Street;

- Berms elevated off of the ground allowing storm water to flow under them and discharge from the facility boundary.

### E. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### Unauthorized Non-Stormwater Discharges

On June 7, 2024, representatives of EDEN personally witnessed a Pacific Coast Producers employee hosing out a plastic container (tote containing chemicals) outside of Gate 2, adjacent to Can Plant 1 and the facility's outdoor chemical storage area. The pollutated wash water then flowed down the v-ditch on E Stockton Street and into an MS4 inlet clearly marked "No Dumping, Drains to River".

In addition, the representatives also noted numerous roof downspouts located at the facility where historic non-stormwater discharges were evident, due to heavy staining on the ground.





### F.  *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Pacific Coast Producers has failed to comply with numerous standard conditions of the General Permit as outlined above and has failed to retain a QISP to trains its Pollution Prevention Team after entering Level 1 status, in violation of General Permit Section XII.

Based on the foregoing violations, it is clear that Pacific Coast Producers has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Pacific Coast Producers may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Pacific Coast Producers, Mona O. Shulman, and other corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is September 15, 2019, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.     CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org


**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.


## VII.     RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $57,617.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Pacific Coast Producers' counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Pacific Coast Producers may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Pacific Coast Producers wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Pacific Coast Producers' counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel.  Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:   rowan.sarah@epa.gov   and Laurie Kermish:   kermish.laurie@epa.gov
Eric Oppenheimer, State Water Resources Control Board, eric.oppenheimer@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:   Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov

# EXHIBIT B



State Water Resources Control Board

## NOTICE OF INTENT
GENERAL PERMIT TO DISCHARGE STORM WATER
ASSOCIATED WITH INDUSTRIAL ACTIVITY (WQ ORDER No. 2014-0057-DWQ)
(Excluding Construction Activities)





GAVIN NEWSOM
GOVERNOR

YANA GARCIA
SECRETARY FOR
ENVIRONMENTAL PROTECTION

| WDID: 5S39I001817 | Status: Active |
|---|---|

## Operator Information
Type: Private Business

| | |
|---|---|
| Name: Pacific Coast Producers | Contact Name: Mona Shulman |
| Address: PO Box 880 | Title: VP General Counsel |
| Address 2: | Phone Number: 916-335-9456 |
| City/State/Zip: Lodi CA 95241 | Email Address: mshulman@pcoastp.com |
| Federal Tax ID: | |

## Facility Information
Level:

| | |
|---|---|
| Contact Name: MIKE Vangundy | Title: |
| Site Name: Pacific Coast Producers Lodi Plant | |
| Address: 32 E Tokay St | |
| City/State/Zip: Lodi CA 95240 | Site Phone #: 209-367-7331 |
| County: San Joaquin | Email Address: mvangundy@pcoastp.com |
| Latitude: 38.1265    Longitude: -121.27175 | Site Size: 49 Acres |
| Industrial Area Exposed to Storm Water: | 14 Acres |
| Percent of Site Impervious (Including Rooftops): | 99 % |

## SIC Code Information

1. 2033    Canned Fruits, Vegetables, Preserves, Jams, and Jellies
2. _____    _____
3. _____    _____

## Additional Information

Receiving Water: Mokelumne River    Flow: Indirectly
Storm Drain System: City of Lodi
Compliance Group:

RWQCB Jurisdiction: Region 5S - Sacramento
Phone: 916-464-3291    Email: r5s_stormwater@waterboards.ca.gov

## Certification

Name: Mike Van Gundy    Date: May 12, 2015
Title: Plant Manager